IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DONTAE SCOTT,                     )     CIVIL NO. 07-00575 SOM/BMK
                                  )
              Plaintiff,          )
                                  )     ORDER GRANTING DEFENDANTS'
         vs.                      )     MOTION FOR SUMMARY JUDGMENT
                                  )
STATE OF HAWAII DEPARTMENT OF )
EDUCATION; ALOHA COLEMAN,         )
principal of Leilehua High        )
School; ROBERT DAVIS, Vice        )
Principal of Leilehua High        )
School; MR. TOKUDA, football      )
coach,                            )
                                  )
              Defendants.         )
_____ )


ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

          Dontae Scott was scheduled to complete all Leilehua

High School graduation requirements at the end of the 2007 fall

semester.  During that semester, Scott was also scheduled to play

on the Leilehua High School varsity football team.  On Thursday,

October 18, 2007, Scott was allegedly attacked in the school

cafeteria by other students.  Although Scott says that he did not

start the fight, he did not allow the dispute to die, acting

belligerently even after school staff had removed him from the

area.  Scott even attempted to return to the area to continue

fighting.  School officials determined that Scott had committed

"disorderly conduct," a "Class B" offense under applicable

administrative rules, and suspended him from school for five days.  He was permanently kicked off the football team.

On November 20, 2007, Scott filed the Complaint in this matter.  Scott says that, even after his suspension ended, he was prevented from returning to school.  The Complaint alleges that Scott's suspension from school and termination from the football team constituted race-based discrimination in violation of 42 U.S.C. § 2000(d) ("Title VI") and 42 U.S.C. §§ 1981, 1981a, and 1983.  Scott says that his suspension and termination from the football team also violated the Individuals with Disabilities in Education Act and § 504 for the Rehabilitation Act.  Scott asserts that Defendants intentionally caused him emotional distress.  Scott seeks $5,000,000.00 in damages and an injunction to prevent Defendants "from the illegal practice of racial discrimination and harassment in denying Plaintiff Dontae Scott his usual position and play time on the Leilehua High School football team."

The Complaint does not clearly articulate the factual and legal bases of Scott's claims.  Scott's oppositions to Defendants' motion for summary judgment suffer from the same lack of focus and clarity.  Scott simply does not raise a genuine issue of fact as to any matter that would preclude summary judgment for Defendants.  The court grants summary judgment in favor of Defendants, ruling:

2

1) that the injunctive relief claim, which seeks an order allowing Scott to play football for Leilehua High School, is moot, as Scott has already graduated from high school;

2) that the State of Hawaii, Department of Education, and the individual Defendants in their official capacities have Eleventh Amendment immunity with respect to Scott's §§ 1981 and 1983 money damage claims;

3) that, with respect to Scott's racial discrimination claims under Title VI and against Defendants in their individual capacities under 42 U.S.C. §§ 1981 and 1983, Scott does not present evidence that Defendants suspended Scott from school and kicked him off the football team because of race-based discrimination;

4) that having withdrawn his race discrimination claim under § 1981a at the hearing, Scott cannot recover under that statute;

5) that, with respect to Scott's claims under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487 ("IDEA"), Scott failed to exhaust his administrative remedies and has not, in any event, demonstrated a viable claim;

6) that, with respect to Scott's Rehabilitation Act claim under 29 U.S.C. § 794, Scott fails to raise a genuine issue of fact as to whether he was discriminated against because of his disability; and

7) that, with respect to Scott's state-law intentional infliction of emotional distress claim, Scott does not raise a triable issue of fact as to whether Defendants acted with the requisite malice and cannot establish the elements of such a claim given the lack of a genuine issue of fact as to whether Defendants discriminated against Scott at all.

II.      SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (effective Dec. 1, 2007). "The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only." Rule 56 Advisory Committee Notes, 2007 Amendments. The court therefore interprets the amended rule by applying precedent related to the prior version of Rule 56(c).

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller

4

<u>Prods., Inc.</u>, 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  <u>Nissan Fire &</u> <u>Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors</u> <u>Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323); <u>accord</u> <u>Miller</u>, 454 F.3d at 987.  "A fact is material if it could affect the outcome of the suit under the governing substantive law."  <u>Miller</u>, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  <u>Nissan</u> <u>Fire</u>, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  <u>Miller</u>, 454 F.3d at 987.  This means that the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."  Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  Miller, 454 F.3d at 988 (quotations and brackets omitted).

III.      BACKGROUND FACTS.

It is undisputed that, in the Fall of 2007, Scott was a senior and a member of the football team at Leilehua High School who was scheduled to complete graduation requirements in December 2007.  See Complaint (Nov. 20, 2007) ¶ 7; Declaration of Robert

Davis (Jan. 20, 2009) ¶ 3; Declaration of Douglas Scott (Nov. 26, 2008) ¶¶ 2, 8.

On Tuesday, October 16, 2007, Scott says that, while walking to a football meeting, another student, "Phatz," told him "Fuck you nigga, ama bring the heat to you and yo friends."[1] Declaration of Dontae Scott (Nov. 26, 2008) ¶ 2.  Scott interpreted this as a threat that Phatz wanted to fight or shoot Scott.  Id.

The following school day, Scott and Phatz were separated from each other at school, with Scott spending the day in his counselor's room.  Id. ¶ 3.

Scott says that, on Thursday, October 18, 2007, while walking to buy a drink at the cafeteria during lunch, he was attacked.  Id. ¶ 4.  For purposes of this motion, it is undisputed that Scott did not start the fight.  Scott says that the fight started when two African-American girls started questioning him about what was going on with Phatz.  Scott says that he told the girls it was none of their business.  Scott says that a third African-American girl "started talking shit" to him. When he told the third girl to "shut [her] face," she threw her cell phone at him.  Immediately after that, "all these Black

---

[1]Scott's Declaration erroneously refers to the year as 2008.

people (who were all of 'Phatz' friends) came and rushed me. Everyone was fighting in the cafeteria."  Scott Decl. ¶ 4.

Immediately upon hearing about the fight in the school cafeteria over her walkie-talkie, Samiann Lealohalani Coleman, the principal of Leilehua High School, went to the cafeteria. See Deposition of Samiann Coleman (Jan. 5, 2009) at 4, 11 (attached as Exhibit 2 to the Declaration of [Plaintiff's] Counsel (Jan. 16, 2009)).  Coleman saw Scott by the soda machine in the cafeteria.  He was being restrained or blocked from other students by school staff.  Id. at 12-14.  Scott, who was struggling, was told to stop arguing and directed to the office. Eventually, Scott left the cafeteria and went up the stairs towards the office, escorted by school staff.  Id. at 14. Coleman then saw Scott break free from the staff "and charge back down the stairs into the cafeteria to try to get at students." Id. at 15.  Although Scott says that he is not "liable" for the fight, he does not deny that he was aggressive or that he failed to comply with the directions to go to the office, choosing instead to break away from the staff escorting him and to "charge" back to the area of the fight.

Coleman says that she saw other members of the football team "trying to break up the people involved."  Id. at 16-17. She says that "Many members of the team were quite helpful to the adults involved to get other students to stop, to pull the crowd

away, so that we could get to the incident." Id. at 17.  Scott submits no admissible evidence contradicting Coleman's testimony on this point.

Later that day, Coleman met with Scott's father.  She says she told him about the fight and that it would take the school "some time to investigate the situation and come to any determination" about what happened.  Id. at 18.  A staff member who had been restraining Scott during the fight described to Scott's father Scott's involvement in the fight.  Id.  Scott's father was told that Scott should stay home the following day, Friday, October 19, while the school continued to investigate what had happened.  Id.

Scott's father says that Coleman told him at that time that half the football team had been involved with the fight.  Scott's father does not elaborate on what that "involvement" was.  See Declaration of Douglas Scott (Nov. 26, 2008) ¶ 3.

On Friday, October 19, 2007, Coleman telephoned Scott's father and told him that, because the investigation was complex, it had not yet been completed.  Coleman told Scott's father that Scott should therefore remain at home for that evening's football game and that Scott should not attend school the following Monday, October 22, 2007.  Coleman says that all of the other students involved in the fight were supposed to stay home the following Monday.  Coleman Test. at 19.  Coleman says that all of

9

the football players who were fighting "were directed to not attend the football game that night . . . , as the investigation was being conducted." Id. at 20.

On Sunday, October 21, 2007, Coleman met with three vice principals, the dean of students, and the complex area superintendent. At that meeting, the involvement of each student in the fight was discussed and compared to Title 8 of the Hawaii Administrative Rules, chapter 19, which governs the Department of Education. Section 8-19-6 of those rules classifies offenses. A "Class A" offense includes assault; burglary; possession or use of dangerous weapons, substances or instruments; possession, use, or sale of drug paraphernalia; extortion; possession or use of firearms; possession, use, or sale of illicit drugs; murder; property damage; robbery; sexual offenses; or terroristic threatening. Haw. Admin. R. § 8-19-6(A)(1). A "Class B" offense includes disorderly conduct; rendering of a false alarm; gambling; harassment; theft; or trespassing. The meeting participants determined that Scott had committed the offense of "disorderly conduct," a "Class B" offense. See Coleman Test. at 23; Declaration of Aloha Coleman (Sept. 24, 2008) ¶ 8.

Although all of the football players who had been fighting were supposed to stay home from the football game, Coleman admits that one football player, identified here as A.P., was involved with the fight but did play in the football game on

10

October 18, 2007.  Coleman Test. at 20.  Coleman says that A.P. played in the game because school officials did not find out about his involvement in the fight until the Monday following the game.  Id.  The school subsequently determined that A.P. had committed an "assault," a "Class A" offense.  See Ex. 4 to Declaration of [Plaintiff's] counsel (Jan. 16, 2009).  A.P. was then suspended from school and kicked off the football team. A.P. therefore did not play in any other football game that season.  See Coleman Test. at 20.

On Monday, October 22, 2007, Scott's father was told that Scott was being suspended for five school days.  See Confidential Disciplinary Notice (Oct. 23, 2007) (attached as Exhibit 4 to Plaintiff's Nov. 26, 2008, Concise Statement); Declaration of Aloha Coleman (Sept. 24, 2008) ¶ 8.  This suspension was imposed pursuant to the principal's crises suspension power.  See Confidential Disciplinary Notice (Oct. 23, 2007); Haw. Admin. R. §§ 8-19-5(a) and 8-19-7.

Leilehua High School's Parent-Student Athletic Handbook requires student athletes to comply with chapter 19 and all school rules.  Page 7 of that handbook requires that a student who commits a "Class A" or "Class B" offense be suspended from all school athletic activities for the "duration of that season." See Declaration of Aloha Coleman (Sept. 24, 2008) ¶¶ 5 and 6 and Ex. B thereto.  Scott and his father, who attended a preseason

11

meeting at which this rule was discussed, received a copy of the Parent-Student Athletic Handbook.  Id. ¶ 7 and Ex. C thereto. Scott's father signed an acknowledgment that he had "Received, read and understood the School Parent/Student-Athlete Handbook." See Ex. C to Coleman Decl.  Scott was kicked off the football team for the remainder of the 2007 football season based on the handbook.  Coleman Decl. ¶ 8.

Scott says that the school improperly kicked him off the football team.  He says that page 12 of the school's Parent-Student Athletic Handbook states that he was only to be suspended from the football team for the duration of his suspension from school.

> Page 12 of the handbook states:
>
> A student-athlete suspended (in school or regular suspension) from school for any reason, will be ineligible to participate in practices, games and trips while on suspension.  Any additional suspension may result in the student-athlete being released from the team.  The suspension days are counted as unexcused absences.

Page 12 of the handbook does not address commission of a "Class A" or "Class B" offense.  Scott was suspended for "disorderly conduct," a "Class B" offense.  Page 7 of the handbook requires that commission of a "Class A" or "Class B" offense result in "suspension from all Leilehua athletic activities for the duration of that season."

Of the students "involved" in the fight, seven were
found by the school to have committed "Class A" or "Class B"
offenses, as defined in chapter 19.  Each was suspended from
school for three to five days.  Scott and two other students,
identified here as Je.E. and Jo.E., were suspended for the "Class
B" offense of disorderly conduct.  Four other students,
identified here as B.C., D.S., T.S., and A.P., were suspended for
the "Class A" offense of assault.

Of the seven students suspended, three (Scott, B.C.,
and A.P.) were members of the football team.  See Ex. 4 to
Declaration of [Plaintiff's] Counsel (Jan. 16, 2009) (unredacted
and sealed documents); Ex. 12 to Plaintiff's Concise Statement of
Facts (Nov. 26, 2008) (redacted and unsealed document); Ex. D to
Defendants' Concise Statement (Sept. 24, 2008) (redacted and
unsealed document).  There is no dispute that each was suspended
from the football team for the remainder of the 2007 football
season.  See, e.g., Coleman Test. at 31 ("no student who is
suspended for a Class A or B offense continues playing with the
team") and at 20 (indicating that A.P. was removed from the
football team).  Of the three football players suspended and
kicked off the team (Scott, B.C., and A.P.), Defendants identify
only Scott as African-American, but Scott's father says that
A.P.'s father is also African-American.  See Ex. 4 to Declaration
of [Plaintiff's] Counsel (Jan. 16, 2009) (unredacted and sealed
document); Ex. D to Defendants' Concise Statement (Sept. 24,

2008) (redacted and unsealed document); Douglas Scott Decl. ¶ 20. Of the seven students suspended, five or six were African-American (Scott, Je.E., Jo.E., D.S., T.S., and, according to Scott's father, A.P.) and three were in special education (Scott, B.C., and A.P.). <u>See</u> Ex. 4 to Declaration of [Plaintiff's] Counsel (Jan. 16, 2009).

On Monday, October 22, 2007, Scott's father met with school officials. Defendants say that Scott, Scott's father, and the school agreed that Scott would stay home for the remainder of the semester. <u>See</u> Coleman Test. at 24-25; Declaration of Robert Davis (Jan. 20, 2009) ¶ 6 ("Mr. Scott and I discussed Dontae staying home to complete his school work with the assistance of Kristie Sasamura. . . . He stated that he had no problem with Dontae staying home to complete his work. He stated that Dontae will complete his work by the end of December and will be done with school. Mr. Scott repeatedly stated that he had no problem with the set up."). This "agreement" was set forth by Defendants in writing:

> It is [sic] has been agreed by the student
> and his parents that due to the incident that
> happened on campus, it will be in his
> [Scott's] best interest to complete his
> assignments at home so he can complete his
> credits at the end of the 1st semester and
> participate in graduation at the end of the
> school year. The student will come to campus
> to pick-up his assignments during non-school
> hours and if he needs any assistance he is
> welcome[] to come to campus after school to
> get help from his care coordinator. But if

14

> he does not need assistance he will complete
> his assignments at home and return the
> assignments to his care coordinator so she
> can return the work to his teachers to be
> graded.

Prior Written Notice of Department Action (Oct. 25, 2007)

(attached as Ex. 3 to Plaintiff's Concise Statement).  That

notice further stated that "Student's care coordinator, parents,

and student agreed that student will complete his assignments at

home so he would not get into any more trouble and complete his

credits for graduation during the 1st semester."  Id.; Coleman

Test. at 24-25.

At the hearing on Defendants' motion, Scott stated that

the agreement was "forced down his throat."  He argued that he

and his father had not agreed that he would complete the

remainder of his school work from home.  Having failed to submit

any admissible evidence indicating a lack of agreement, Scott

asked for and received leave to submit evidence limited to the

existence or nonexistence of such an agreement.  On February 20,

2009, this court followed up with an Entering Order, which

stated:

> Any supplemental filing submitted by
> Plaintiff on or before noon on February 27 in
> connection with Defendants' motion for
> summary judgment must be limited to evidence
> such as declarations and/or exhibits (not
> argument or a memorandum) relating to the
> existence or nonexistence of an agreement as
> to Scott's completion of the semester.  The
> filing must not seek to address other
> matters.

On February 26, 2009, Scott submitted a document purporting to be his declaration.  See Plaintiff Dontae Scott's Supplemental Declaration (Feb. 26, 2009) (Docket No. 80).  This declaration was signed not by Scott, but by his father.  Accordingly, it is stricken in its entirety, as Scott's father is not competent to attest to the matters stated in Scott's declaration, which discusses matters Scott says Scott saw and was personally involved with.

On February 26, 2009, Scott also submitted a Supplemental Declaration of Douglas Scott, Scott's father.  See Supplemental Declaration of Douglas Scott (Feb. 26, 2009) (Docket No. 79).  Although Scott was expressly ordered to limit any supplemental evidence to the issue of whether there was or was not an agreement for Scott to complete his school work at home, Scott's father's declaration went far beyond that limited issue.  Accordingly, except for paragraphs 17 to 21, 25, 26, and 29, which the court reads as pertinent to whether there was an agreement, Douglas Scott's February 26, 2009, declaration is stricken as violative of court rules as well as of this court's express order.

Douglas Scott's February 26, 2009, declaration could arguably be read as consistent with Defendants' assertion that there was an agreement that Scott would complete his school work from home.  In the paragraphs of his declaration that have not

16

been stricken, Douglas Scott indicates that he did not agree to
have his son "permanently suspended" or "permanently barred" from
school.  Defendants are not claiming to have had an agreement to
"permanently suspend" or "permanently bar" Scott from school.
However, the court does not give Douglas Scott's declaration such
a cramped reading, concluding instead that Douglas Scott meant to
dispute the existence of any agreement that Scott would complete
his school work from home, regardless of whether Scott was
"permanently suspended" or "permanently barred."  The court notes
that the declaration is silent as to whether the agreement was
"forced down Scott's throat," as represented by Scott's counsel
at the hearing.

Construed broadly, Douglas Scott's declaration says
that Douglas Scott did not discuss his son's being barred from
classes with Coleman, the principal.  Defendants claim that
Douglas Scott did discuss his son's completion of school work
from home with Davis, not Coleman.  The court construes Douglas
Scott's declaration as indicating that Douglas Scott had no such
conversation with any school official.

On October 26, 2007, the day after Scott's suspension
had ended, Scott went to school at about 10:15 a.m. to pick up
his school work.  Scott was not allowed on campus.  See
Declaration of Douglas Scott (Nov. 26, 2008) ¶¶ 3-4 and Ex. 2
thereto.  Although Scott's father says that Scott was attempting

17

to "return to school," Scott's father does not indicate any personal knowledge of or other basis for that statement in his declaration.  Douglas Scott Decl. ¶ 4.  It therefore does not appear to be admissible evidence.

Because it was 10:15 a.m. and because Scott had his baby and girlfriend with him, Coleman did not view Scott as attempting to return to classes.[2]  See Coleman Test. at 26. Coleman says that, in light of the "agreement" that Scott would complete his class work from home and would not come to school during school hours, Scott was "directed" to stay off campus while staff went to get his work.  Id. at 27-28.

Scott says that his suspension from school and his termination from the football team were racially motivated. Scott's only evidence of racial motivation is what he says is the school's more favorable treatment of another student, A.L. According to Scott's father, A.L. threw a punch during a football game.  See Douglas Scott Decl. ¶ 19.  Scott's father describes A.L. as "local."  According to Douglas Scott, A.L. was not suspended from school and was suspended from the football team for only one game.  Id.  There appears to be no dispute that A.L. was ejected from the game, which meant that, under a rule set forth on page 12 of the Leilehua High School Parent/Student-

---

[2]Coleman's belief is consistent with Scott's stricken declaration, which indicates in paragraph 9 that Scott went to school to get his homework.

18

Athlete Handbook, A.L. was automatically ineligible to play in the following game.  <u>See</u> Leilehua High School Parent/Student-Athlete Handbook at 12 ("9. Any student-athlete who is ejected/disqualified from an athletic contest shall be ineligible to participate in the next season game.").  Douglas Scott does not establish personal knowledge of anything more than that. There is no evidence that school officials found A.L. to have committed a "Class A" or "Class B" offense, or that the circumstances required such a determination.  Nor is there any evidence that Coleman, the person who suspended Scott under her crises suspension powers, knew that A.L. had supposedly thrown a punch during the football game and had thereafter been ejected from the game.  A.L.'s race is also far from clear.

Scott also complains that Yokuda, the football coach, said nothing that would help Scott get recruited when Yokuda was contacted by Arizona State University Coach Taylor.  Scott says that, rather than providing Coach Taylor with a tape of Scott's games, Yokuda told Coach Taylor that it was Scott's responsibility to provide him with the tape.  <u>See</u> Douglas Scott Decl. ¶ 22.  Scott complains that Yokuda did not tell Scott about Coach Taylor's interest.  <u>Id.</u>  It does not appear that Scott's father has sufficient personal knowledge to support his declaration on this point, as he would not have been privy to any conversation between the coaches.

19

Coach Yokuda says that only one school, Eastern Arizona Junior College (not Arizona State University), contacted him about Scott.  Yokuda says that it was Coach Taylor Tuilaepa of Eastern Arizona Junior College who made that contact.  Yokuda says that he told him that Scott was 6'3" and 275 pounds and that Yokuda saw Scott as a defensive tackle.  When the coach asked if Yokuda had any highlight film of Scott, Yokuda told him that it was the player's responsibility to create his own highlight video.  Yokuda says he did not say that Scott was not a good player.  See Declaration of Nolan Tokuda (Jan. 20, 2009) ¶¶ 4-5, 7.  Yokuda says that he told Scott's father that the coach from Eastern Arizona Junior College wanted to see a highlight video of Scott.  Yokuda says that Scott's mother subsequently demanded that Yokuda make the video, but that he reminded her that it was the player's responsibility to do so.  Id. ¶ 6.  Yokuda notes that Scott's high school transcript demonstrates that Scott did not meet NCAA requirements to get into a college or university. Yokuda says that Scott's IEP shows that Scott's plan was to attend a junior college.  Id. at 7.

Scott also complains about a number of other matters. For example, Scott says that Yokuda changed Scott's jersey number from 88 to 99.  See Douglas Scott Decl. ¶ 11.  He complains that he was switched from offense to defense because Coach Tufuie wanted his son to play Scott's offensive position.  Id. ¶ 12.

Scott complains that t-shirts were made with the football players' names on them, but that his name was omitted.  Id. ¶ 15. Scott complains that, when the student body voted him homecoming king, the school gave him a choice of playing football or being homecoming king.  He says that, in previous years, football players were allowed to be homecoming kings and to play football. Id. at 25.  Nothing is said about the race of these prior homecoming kings.

Scott is currently attending Golden West College in Huntington Beach, California, where he is playing football.  See Coleman Decl. ¶ 4 and Ex. A thereto (copy of football team roster); Douglas Scott Decl. ¶ 30 ("Dontae has since graduated and is now playing football.").

IV.      ANALYSIS.

A.   Scott's Injunctive Relief Claim is Moot.

Scott's Complaint seeks an order enjoining Defendants "from the illegal practice of racial discrimination and harassment in denying Plaintiff Dontae Scott his usual position and play time on the Leilehua High School football team." Complaint at 12.  Because Scott has graduated from Leilehua High School and is now playing junior college football, Scott's request for injunctive relief is moot.  See DiGiorgio v. Lee, 134 F.3d 971, 974 (9th Cir. 1998) (the doctrine of mootness precludes

a federal court from deciding questions that cannot affect the rights of parties in the case before the court).

Scott argues that his injunctive relief claim is not moot because Defendants can be enjoined from further discriminating against current and future students based on their race. However, Scott's Complaint seeks an injunction only with respect to Defendants' denial of Scott's "usual position and play time on the Leilehua High School football team." Complaint at 12. Nothing in the Complaint puts Defendants on notice that Scott is seeking broader injunctive relief. Accordingly, Scott's request for injunctive relief is moot.

      B.   Summary Judgment is Granted in Favor of Defendants on Scott's Race Discrimination Claims.

Scott's Complaint asserts race discrimination in violation of Title VI and of 42 U.S.C. §§ 1981, 1981a, and 1983. See Complaint, Causes of Action I (Title VI), III (§§ 1981 and 1981a), and IV (§ 1983). Summary judgment is granted in favor of Defendants on each of these claims.

      1.   Scott Has Withdrawn His § 1981a Claim.

Scott's Complaint asserts a violation of 42 U.S.C. § 1981a, which provides for damages in cases involving intentional discrimination in employment. At the hearing on the present motion, Scott withdrew his § 1981a claim.

2.    Scott's Official Capacity Claims for Money
      Damages Under §§ 1981 and 1983 Are Barred by
      the Eleventh Amendment.

Scott seeks money damages under 42 U.S.C. §§ 1981 and 1983, which generally "prohibit discrimination based on race, ethnic background, ancestry, and/or national origin committed under color of law." Mustafa v. Clark County Sch. Dist. 157 F.3d 1169, 1180 (9th Cir. 1998). However, the State of Hawaii, Department of Education and the individual Defendants in their official capacities have Eleventh Amendment immunity with respect to money damage claims under §§ 1981 and 1983. Under the Eleventh Amendment, a state is immune with respect to certain actions brought in federal court by her own citizens or citizens of other states. Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 106 (1984); Mitchell v. Los Angeles Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1989). A suit against state officials in their official capacities is a suit against the state itself and therefore is also subject to the Eleventh Amendment bar. Will, 491 U.S. at 71 ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"); Pennhurst, 465 U.S. at 101 ("The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest'") (citing Ford Motor Co. v. Department of Treasury, 323 U.S. 459,

464 (1945)).  States, state agencies, and state officials may,
however, be held to answer in federal court when the state waives
its Eleventh Amendment immunity or Congress expressly abrogates
the states' Eleventh Amendment immunity with respect to a
particular federal cause of action.  See Bliemeister v.
Bliemeister (In re Bliemeister), 296 F.3d 858, 861 (9th Cir.
2002).

Defendants timely asserted Eleventh Amendment immunity
with respect to Scott's §§ 1981 and 1983 claims, and Congress did
not abrogate Hawaii's Eleventh Amendment immunity with respect to
those claims.  Accordingly, to the extent Scott seeks money
damages under §§ 1981 and 1983 against Defendant State of Hawaii,
Department of Education, a state agency, and against the
individual Defendants in their official capacities, those claims
are barred by the Eleventh Amendment.  See Sherez v. State of
Haw. Dept. of Educ., 396 F. Supp. 2d 1138, 1143 (D. Haw. 2005)
(holding that claims asserted against the State of Hawaii,
Department of Education, and against a Department of Education
educator in her official capacity were barred by the Eleventh
Amendment); Office of Hawaiian Affairs v. Dept. of Educ., 951 F.
Supp. 1484, 1492 (D. Haw. 1996) (holding that the State of
Hawaii, Department of Education is a state agency that is
entitled to Eleventh Amendment immunity from § 1983 claims).

3.  Scott Does Not Raise a Genuine Issue of Fact
    As To Whether His Race Was a Factor in His
    Punishment.

The court turns now to Scott's claims of race discrimination in violation of Title VI and to his race discrimination claims against persons sued in their individual capacities under 42 U.S.C. §§ 1981 and 1983.  See Complaint, Causes of Action I (Title VI), III (§§ 1981 and 1981a), and IV (§ 1983).  Because Defendants have demonstrated that Scott was punished for his actions consistent with applicable rules, and because Scott raises no genuine issue of fact as to whether he suffered race-based discrimination, summary judgment is granted in favor of Defendants on these race discrimination claims.

Although Scott did not initiate the fight in the school cafeteria, he does not dispute that school staff had to restrain him.  Nor does he dispute that, when he was subsequently escorted to the office, he escaped from school staff and attempted to return to the area of the fight.  See Coleman Test. at 12-15. Scott does not dispute that this conduct amounted to "disorderly conduct," a "Class B" offense.  Scott was suspended from school for five school days pursuant to the school principal's crises suspension power.  See Confidential Disciplinary Notice (Oct. 23, 2007) (attached as Exhibit 4 to Plaintiff's Nov. 26, 2008, Concise Statement); Declaration of Aloha Coleman (Sept. 24, 2008) ¶ 8; Haw. Admin. R. §§ 8-19-5(a) and 8-19-7.

25

Having committed a "Class B" offense, Scott was
suspended from all school athletic activities for the "duration
of that season."  This suspension comported with page 7 of the
Leilehua High School Parent-Student Athletic Handbook.  See
Declaration of Aloha Coleman (Sept. 24, 2008) ¶¶ 5 and 6 and
Ex. B thereto.  Notwithstanding the rules allowing the school to
suspend him from school and requiring the school to kick him off
the football team, Scott argues that he suffered race
discrimination because school administrators applied the rules in
a discriminatory manner.  Scott, however, presents no evidence
from which race discrimination may even be inferred.

The court is unpersuaded by Scott's argument that race
discrimination may be inferred by the different treatment
accorded other members of the football team who were "involved"
with the fight.  Scott does not establish that the other players'
"involvement" was similar to his.  The principal, Coleman, says
that she saw members of the football team "trying to break up the
people involved."  Coleman Test. at 16-17.  She says that "Many
members of the team were quite helpful to the adults involved to
get other students to stop, to pull the crowd away, so that we
could get to the incident."  Id. at 17.  Scott submits no
admissible evidence contradicting Coleman's testimony on this
point.  After an investigation, the school determined that only
seven students had committed "Class A" or "Class B" offenses that

warranted suspension from school.  Scott and two other students (Je.E. and Jo.E.) were suspended for the "Class B" offense of disorderly conduct.  Four other students (B.C., D.S., T.S., and A.P.) were suspended for the "Class A" offense of assault.  Scott has presented no evidence indicating that the school's investigation was flawed.

Of the seven students suspended, three (Scott, B.C., and A.P.) were members of the football team who were suspended for the remainder of the football season.  See Ex. 4 to Declaration of [Plaintiff's] Counsel (Jan. 16, 2009) (unredacted and sealed documents); Ex. 12 to Plaintiff's Concise Statement of Facts (Nov. 26, 2008) (redacted and unsealed document); Ex. D to Defendants' Concise Statement (Sept. 24, 2008) (redacted and unsealed document); Coleman Test. at 31 ("no student who is suspended for a Class A or B offense continues playing with the team") and at 20 (indicating that A.P. was removed from the football team).  Of the three football players suspended and kicked off the team (Scott, B.C., and A.P.), Scott and possibly A.P. are African-American.  As Scott's declaration indicates that the fight in the cafeteria arose from a dispute among various African-American individuals, it is not surprising that African-American students were among those disciplined.  Nothing about the investigation or the subsequent punishment of the students involved indicates that school administrators punished Scott

27

because of his race.  To the contrary, school officials followed applicable rules and punished students in accordance with those rules.

At best, Scott says that another student-athlete, A.L., threw a punch <u>during</u> a football game.  <u>See</u> Douglas Scott Decl. ¶ 19.  Scott's father indicates that A.L., who is "local," was not suspended from school and was suspended from the football team for only one game.  <u>Id.</u>  Even assuming Scott's father could be deemed to have personal knowledge of the incident, Scott does not raise a genuine issue of fact as to whether Scott suffered race discrimination.  There is no dispute that A.L. was ejected from the football game.  A.L.'s one-game suspension was therefore required by page 12 of the Leilehua High School Parent/Student-Athlete Handbook, which provides, "9. Any student-athlete who is ejected/disqualified from an athletic contest shall be ineligible to participate in the next season game."

Scott presents no evidence indicating that the school administrators who suspended Scott and kicked Scott off the football team were even aware of the alleged punch thrown by A.L. during a football game.  While this court has no problem assuming that Coach Yokuda knew about A.L.'s ejection from the game and subsequent one-game suspension, Coach Yokuda did not participate in the decisionmaking that resulted in Scott's suspension from school and automatic removal from the football team based on

28

"disorderly conduct," a "Class B" offense.  That decision was made by Coleman, three vice principals, the dean of students, and the complex area superintendent, who determined that Scott had committed the offense of "disorderly conduct," a "Class B" offense.  See Coleman Test. at 23; Coleman Decl ¶ 8.

Scott presents no evidence that any school administrator determined that A.L. had committed either the "Class A" offense of "assault" or the "Class B" offense of "disorderly conduct."  The circumstances of A.L.'s punch remain unclear.  Even if ejected from the game, A.L. may have had an explanation for his action that, had it been communicated to the school, would have affected any school discipline.  In short, Scott presents no admissible evidence indicating that A.L. was similarly situated to Scott but treated more favorably by school administrators such that an inference of race discrimination may be drawn.

None of Scott's other complaints raises a genuine issue of material fact as to whether he suffered punishment because of his race.  For example, Scott complains that Coach Yokuda was not helping him get recruited by colleges.  However, only Eastern Arizona Junior College expressed any interest in Scott.  Yokuda says that he told its coach that Scott was 6'3" and 275 pounds and that Yokuda saw Scott as a defensive tackle.  When that coach asked if Yokuda had any highlight film of Scott, Yokuda told him

29

that it was the player's responsibility to create their own highlight video.  See Declaration of Nolan Tokuda (Jan. 20, 2009) ¶¶ 4-5, 7.  Scott does not present any evidence indicating that Coach Yokuda treated Scott differently from any other player.

Scott also complains that Yokuda changed Scott's jersey number from 88 to 99.  See Douglas Scott Decl. ¶ 11.  He complains that he was switched from offense to defense because Coach Tufuie wanted his son to play Scott's offensive position. Id. ¶ 12.  Scott complains that t-shirts were made with all of the football players' names on them, except his.  Id. ¶ 15. Scott also complains that, when the student body voted him homecoming king, the school gave him a choice of playing football or being homecoming king.  He says that, in previous years, football players were allowed to be homecoming kings and play football.  Id. at 25.

With respect to these alleged incidents, Scott again presents no evidence that he was treated differently because of his race or that race had any influence on the manner in which he was treated.  He does not, for example, indicate whether other players' numbers were changed or not.  Scott is silent with respect to whether any other student of any race escaped the preferential treatment any coach allegedly gave his own children. He does not say whether he was still a member of the team when the t-shirts were made or whether he even pointed out the absence

of his t-shirt to the school or how the school reacted.  Nor does he state the race of previous homecoming kings.

Scott similarly fails to raise a genuine issue as to whether he suffered race discrimination when told to stay off campus after he had served his suspension.  No reasonable inference of race discrimination can be drawn from the school's direction to Scott to stay off campus when Scott showed up at about 10:15 a.m. with his baby and girlfriend after his suspension had ended.  The timing and the companions indicate that Scott did not go to school to attend class.[3]  See Coleman Test. at 26.

Even if there is an issue of fact as to whether Scott wanted to attend class or as to whether Scott was asked to stay off-campus because of an agreement, Scott does not provide the court with any basis for concluding that his race contributed to his being kept away from school.  Nor does an inference of race discrimination arise merely because Scott completed graduation requirements from home.

Because each of Scott's race-based discrimination claims requires some amount of proof of race-based discrimination, and because Scott fails to establish a genuine issue of fact as to whether he was punished even in part because

---

[3]Indeed, Scott's stricken February 26, 2009, declaration indicates that Scott went to school on October 26, 2007, to get his homework, not to attend class.

of his race, summary judgment is granted in favor of Defendants

on each of Scott's race discrimination claims.  See 42 U.S.C.

§ 2000(d) ("No person in the United States shall, on the ground

of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal

financial assistance."); Mustafa, 157 F.3d at 1180 ("Sections

1981 and 1983 prohibit discrimination based on race, ethnic

background, ancestry, and/or national origin committed under

color of law.  To prevail under those statutes, Mustafa must

prove that the defendants acted with intent to discriminate."

(citations omitted)).

> C.   Summary Judgment is Granted in Favor of Defendants
>      on Scott's IDEA Claim.

Cause of Action V of the Complaint alleges a violation

of the IDEA, which requires any state receiving federal financial

assistance for special education to implement a policy that

ensures that every disabled child in that state who has a

disability is provided with a free appropriate public education

designed to meet the unique needs of that disabled child.[4]  20

U.S.C. § 1412.  See Kletzelman v. Capistrano Unified Sch. Dist.,

91 F.3d 68, 69 (9th Cir. 1996) (the IDEA "'confers upon disabled

students an enforceable substantive right to public education in

---

[4]There is no dispute that Hawaii receives federal
financial assistance for special education.

participating States, and conditions federal financial assistance upon a State's compliance with substantive and procedural goals of the Act'") (citations omitted); Poolaw v. Bishop, 67 F.3d 830, 834 (9th Cir. 1995).

The bases for Scott's IDEA claim are murky.  His opposition indicates that his IDEA claim is based on his contention that, although he was told he was suspended for five days, he was allegedly suspended for longer.  Scott says that his so-called five-day suspension deprived him of a right to appeal the suspension, because an appeal can only be taken from a suspension exceeding ten days.  Scott says that his rights under his "IEP," which, under 20 U.S.C. § 1401(14), is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of [Title 20]," were infringed upon because he was suspended without consultation with his IEP team and without a meaningful due process hearing.

Defendants move for summary judgment, arguing that Scott failed to exhaust his administrative remedies.  This court agrees.  The Ninth Circuit has recognized that exhaustion is required in IDEA cases, unless resorting to the administrative process would be futile or inadequate, or unless the agency has adopted a policy or pursued a practice of general applicability that is contrary to law.  See Hoeft v. Tuscon Unified Sch. Dist.,

967 F.2d 1298, 1303 (9th Cir. 1992).  Scott's parents requested an expedited due process review of Scott's punishment.  See Ex. 6 to Scott's concise statement (letter from Scott's parents to Mr. Yukumoto, Vice Principal of Leilehua High School).  However, this request provided no detail as to the basis for the request, stating only that "Mr. Tusaka is fully aware of the Complaint." A request for a due process hearing must include "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem."  20 U.S.C. § 1415(b)(7)(A)(ii)(III).  As the request did not contain the required description, it was deficient.  This deficiency prevents Scott from establishing that he complied with exhaustion requirements.

Notwithstanding the deficiencies in Scott's hearing request, a due process hearing was held on November 19, 2007. See Ex. 10 to Scott's Concise Statement.  At this hearing, Scott complained that his suspension had exceeded five days and that no IEP meeting had been held before the suspension was imposed.  See id.  The "resolution" of the hearing was the school's immediate convening of an IEP meeting and communication to Scott and his parents that they could pursue a chapter 19 appeal of Scott's suspension.  Id.

Even if Scott's barebones request for a hearing could be deemed sufficient to exhaust administrative remedies, Scott

34

fails to identify any violation of the IDEA or any right under his IEP.  If Scott is arguing that, under Hawaii Administrative Rule section 8-19-9, he had a right to appeal his suspension to the district superintendent if the suspension exceeded ten days, that rule has nothing to do with whether Defendants violated the IDEA.  Scott presents no evidence indicating that he was prevented from filing an appeal to the superintendent.  In fact, his due process hearing resulted in Scott's being told he could file an appeal.  Scott certainly knew that he had not attended classes for more than ten days.  If Scott believed that he had been improperly suspended for more than five days, nothing prevented him from appealing under the provisions of section 8-19-9.

Scott may be asserting that, under Hawaii Administrative Rule section 8-53-35, any crisis suspension of more than ten consecutive days amounted to a change in his educational placement such that the placement decision should have been made by his IEP team (Haw. Admin. R. § 8-53-21).  To the extent Scott is asserting that his IEP team should have held a meeting prior to any change in his educational placement, Scott fails to demonstrate a violation of the IDEA that would entitle him to maintain his IDEA claim.  As discussed above, Scott did not properly exhaust his administrative process.  Even if it could be said that he did exhaust his administrative remedies,

the result of Scott's due process hearing was a requirement that the school immediately convene an IEP meeting.  To bring a civil action in this court regarding the decision of the due process hearing officer, Scott must be aggrieved.  See 20 U.S.C. § 1415(i)(2)(A).  Because Scott is not here asserting that an IEP meeting was not held as ordered by the due process hearing officer, Scott was not aggrieved by the administrative process.

> D.   Summary Judgment is Granted in Favor of Defendants on Scott's Rehabilitation Act Claim.

Cause of Action V of the Complaint also asserts that Defendants violated section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which "gives certain rights to students with disabilities."  Forest Grove Sch. Dist. v. T.A., 523 F.3d 1078, 1081 n.2 (9th Cir. 2008).  In pertinent part, § 794 states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

Defendants move for summary judgment on Scott's Rehabilitation Act claim, arguing that there is no evidence that they discriminated against Scott based on a disability.  This court agrees.  As set forth above, Leilehua High School officials

36

disciplined Scott for his commission of a "Class B" offense.
Scott fails to raise a genuine issue of fact about whether the
disciplinary measures were applied in a disiminatory manner,
including his argument that he suffered disability
discrimination.  Accordingly, summary judgment is granted in
favor of Defendants on Scott's Rehabilitation Act claim.

> E.   Summary Judgment is Granted in Favor of Defendants
>      on Scott's State-Law Tort Claims.

In Cause of Action II of the Complaint, Scott asserts
that Defendants intentionally caused him emotional distress.
Defendants move for summary judgment on this state-law claim,
arguing that Coleman, Davis, and Tokuda are immune with respect
to that claim under Towse v. State, 64 Haw. 624, 647 P.2d 696
(1982), and Mederios v. Kondo, 55 Haw. 499, 522 P.2d 1269 (1974).

In Towse, the Hawaii Supreme Court explained that
"non-judicial governmental officials, when acting in the
performance of their public duty, enjoy the protection of what
has been termed a qualified or conditional privilege."  Towse, 64
Haw. at 631-632, 647 P.2d at 702.  "[I]n order for an action to
lie against an official acting under a claim of privilege, it is
essential that the injured party allege and prove, to the
requisite degree, that the official had been motivated by malice
and not by an otherwise proper purpose."  Id. at 632, 647 P.2d at
702.  To determine whether Defendants have acted with the
requisite degree of malice, courts examine whether Defendants

37

acted "as a reasonable man under the circumstances."  Id. at 633, 647 P.2d at 703.

Defendants argue that Scott does not even allege, must less show, that they acted with malice.  All submitted declarations indicating that they had not disciplined Scott maliciously.  See Coleman Decl. ¶ 13 ("I never at any time had any malice or ill-will towards Plaintiff."); Davis Decl. ¶ 5 ("I never at any time had any malice or ill-will towards Plaintiff."); Tokuda Decl. ¶ 5 ("I never at any time had any malice or ill-will towards Plaintiff.").  As discussed above, Scott was disciplined for his "disorderly conduct" pursuant to applicable administrative and school rules.  Malice cannot reasonably be inferred under the circumstances, and Scott presents no evidence that Defendants' actions were anything but reasonable.  See Towse, 64 Haw. at 633, 647 P.2d at 703.

Scott's opposition does not dispute Defendants' assertions that they acted without malice.  Instead, Scott argues that, under principles set forth in Saucier v. Katz, 533 U.S. 194, 201 (2001), which involves qualified immunity for officials with respect to alleged violations of federal constitutional rights, summary judgment should not be granted.  This argument has nothing to do with the malice requirement.  Scott identifies no genuine issue of material fact as to whether Coleman, Davis,

or Tokuda acted with malice.  They are therefore entitled to summary judgment on Scott's emotional distress claim.

Even if Scott did present evidence of state officials' malice, his emotional distress claim would not stand.  That is because, whether asserted against a government official or a private person, the tort of intentional infliction of emotional distress "consists of four elements: '1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another.'"  <u>Young v. Allstate Ins. Co.</u>, 119 Haw. 403, ___, 198 P.3d 666, 692 (2008).  Because Scott's claim of emotional distress arises out of the alleged discriminatory conduct discussed above, and because Scott has failed to raise a genuine issue of fact as to whether Defendants discriminated against him, Scott cannot prove that Defendants acted outrageously.  All Defendants are therefore entitled to judgment on Scott's intentional infliction of emotional distress claim.

V.        <u>CONCLUSION.</u>

For the reasons set forth above, summary judgment is granted in favor of Defendants on all claims asserted in Scott's

Complaint.  The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 5, 2009.



  /s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

Scott v. State of Hawaii, Department of Educ., CIVIL NO. 07-00575 SOM/BMK; ORDER GRANTING MOTION FOR SUMMARY JUDGMENT